UNITED STATES DISTRICT CIOURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMMIE LEE THOMAS,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____ /

Case No. 17-13239

District Judge Linda V. Parker

Magistrate Judge R. Steven Whalen

## REPORT AND RECOMMENDATION

Plaintiff Tammie Lee Thomas ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner in denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI respectively of the Social Security Act. The parties have filed cross-motions for summary judgement which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgement [Docket #19] be GRANTED and that Plaintiff's Motion for Summary Judgement [Docket #15] be DENIED.

## I. PROCEDURAL HISTORY

On April17, 2015 and April 22, 2015, Plaintiff filed applications for SSI and DIB, alleging disability as of December 1, 2012 (Tr. 143-150).  Upon initial denial of the claim in June, 2015 (Tr. 10), Plaintiff requested an administrative hearing, held on June 22, 2016 in Detroit, Michigan (Tr. 10).  Administrative Law Judge ("ALJ") Therese Tobin presided.  At the hearing, Plaintiff amended her disability onset date to April 22, 2015 (Tr. 10, 38).

Plaintiff, represented by Thomas Newland, testified (Tr. 36-60), as did Vocational Expert ("VE") Gary Sino (Tr. 60-66).  On August 22, 2016, ALJ Tobin determined that Plaintiff was not disabled (Tr. 7-19).  Plaintiff filed suit in this Court on October 3, 2016 [Docket #1].

## II. BACKGROUND FACTS

Plaintiff, born on January 20, 1974, was 46 years old at the time of the more recent administrative decision (Tr. 149, 19).  She completed 11th grade and vocational training in employability skills in 1993 (Tr. 48, 173).  She worked previously as a security guard and dispatcher (Tr. 41, 173).  She alleges disability as a result of a herniated lumbar disc (L4/L5), tendinitis, arthritis, neck pain from a previous fractured collar bone, knee and leg pain (Tr. 172).

### A.  Plaintiff's Testimony (June 22, 2016)

Plaintiff offered the following testimony:  She worked in childcare, dropping off and picking up her nephew at school, as a security guard and dispatch, and as a taxi

transporter (Tr. 40-41).  She also worked as a cafeteria worker in 2002-2003 (Tr. 42-43).

At no time during these jobs did Plaintiff lift any items (Tr. 40-43).

She was unable to work because she "can't do much of anything" (Tr. 44).  When

she attempted to pick things up, she dropped them and was in pain for the remainder of

the day (Tr. 44).  Her medication caused her extreme drowsiness (Tr. 44).

She used a four-pronged cane and wore several braces, all prescribed to her: one

around her mid-section, one on each wrist/hand (one was missing due to misplacement),

and one knee brace (Tr. 45).  She does not use a walker (Tr. 45).  She could sometimes

move around without her cane before her medications start working (Tr. 45).  She needed

her cane because her leg would give out (Tr. 46).

Plaintiff was 42 years old, stands at 5'6", weighs 211 pounds (Tr. 47).  She was

currently single (Tr. 46-47).  She held a driver's license and used it "once in a while"

when it was a necessity or when she needed her medications (Tr. 47).  She did not drive

herself to the hearing (Tr. 47).  Plaintiff left school after the 11th grade and completed a

vocational course in employability skills in 1993 (Tr. 47-48).  She lived in a single story

house with her three children (Tr. 48).  She was able to walk, at most, 2-3 steps in her

house with the help of a railing and her cane (Tr. 48).

Plaintiff was unable to prepare herself food, clean, do household chores, or interact

with her son like she once was able to (Tr. 49, 51).  Her daily routine consisted of getting

up, eating, going to the restroom, and going back to bed due to her pain (Tr. 49).  She

took her medication daily and slept majority of the time while on it (Tr. 49).  Her mother,

daughter, and son all helped to support her and the house (Tr. 49-50).  Her daughter

assisted her every morning when getting dressed, due to her inability to put on pants, a

shirt, or do her hair by herself (Tr. 50).  She needed assistance getting in and out of the

bath tub, but was able to wash herself, and she used a chair to sit on due to her inability to

sit completely down in the tub (Tr. 50).

Her physical limitations began two years ago after her back "went out," leaving

her unable to walk, go to the restroom, or do anything (Tr. 51).  Since then, there had

been several other occasions when her back would "go completely out" (Tr. 51).  She

believed that this back injury was precipitated by several car accidents, the first being

when she was hit by a car as a child, and it had consistently gotten worse since then (Tr.

51).  No surgery had been recommended by a surgeon, and steroid injections had not

improved her condition (Tr. 52).

Plaintiff did not consume alcohol but used medical marijuana (Tr. 52-53).  She

took medications as prescribed and when she took all of her medications together, she

normally slept the entire day (Tr. 53).  Her children organized and refilled her pill

organizer due to her memory problem of several years standing (Tr. 53-54).  She had

auditory and visual hallucinations and had been diagnosed with bipolar disorder (Tr. 55).

She attended psychiatric counseling and saw a doctor for stress and hallucinations (Tr.

54-55).  She had been prescribed Seroquel and Latuda for her bipolar disorder (Tr. 55).

Plaintiff received food stamps and insurance through the state (Tr. 55).  She could

only walk a few feet before needing to sit down, but acknowledged that she had to walk

into the building, to the elevator, and to the courtroom without sitting down (Tr. 55-56).

She stated that she needed to sit down, but no chairs were available, so she leaned against

the wall (Tr. 56).  She could stand and sit for no more than 10-15 minutes because her knees would start to "buckle" (Tr. 56).  She was only able to lift about two pounds at most and was not able to bend, squat, or crawl (Tr. 56-57).  She was able to reach for items in front of her, although her fingers and hands would hurt (Tr. 57).  She no longer attended social gatherings with family or friends because she did not like crowds (Tr. 57-58).  When her family and friends visited her, she retreated to her room and would only interact with them (including her 9 year old son) if they visited her in her room (Tr. 59).  She no longer attended church because of her extreme pain and her inability to move to get up and ready (Tr. 58).  She only left her house for doctor appointments and the grocery store (Tr. 59).

  B.  Medical Records

    1.  Records Related to Plaintiff's Physical Treatment

    August, 2014 through May, 2016 records by Maan A. Askar, MD note Plaintiff's report of lower back pain and radiculopathy.  Dr. Askar administered shots of dexamethasone and bupivacaine August through October, 2014 (Tr. 212-16).  In November, 2014 Plaintiff reported that she injured herself in a fall and Dr. Askar prescribed both a right knee and right wrist brace, and prescribed Flexeril for ongoing use (Tr. 223, 286).  A January, 2015 MRI of the knee showed a small popliteal cyst, but was otherwise unremarkable (Tr. 211, 230).  February, 2015 MRI of the lumbar spine showed lumbar spondylosis with disc herniation at L4-L5[1] with mild canal stenosis and mild

---

[1] Record of February, 2015 MRI of the spine makes reference to a previous July, 2004 MRI of the spine with evidence of L4-L5 disc herniation.  There is no record of this July, 2004 MRI included in the present documentation (Tr. 228, 223).

cervical spondylosis (Tr. 228-29).  The following month she was prescribed a back brace (Tr .219).

In May, 2015 Dr. Askar found normal wrist and knee functioning (Tr. 325).  In August, 2015, Dr. Askar prescribed wrist braces for Carpel Tunnel Syndrome ("CTS")-like symptoms (Tr. 316, 313).  The following month, Dr. Askar noted Plaintiff's claims of shoulder pain, unsupported by evidence (Tr. 312).  In October, 2015 Plaintiff reported she had daily severe neck, back, thumb, and knee pain (Tr. 240, 242).  Plaintiff denied anxiety and depression (Tr. 243).  Her psychological state was deemed unremarkable (Tr. 243).  She otherwise demonstrated a limited range of motion of her lumbar and cervical spine (Tr. 244). Her "all joint exam" was within the normal limits (Tr. 244).  The physician ordered an X-ray exam of Plaintiff's neck, spine, and lumbar, with a follow up scheduled for the next week[2] (Tr. 240-41, 242).

January through May, 2016 records by Dr. Askar note Plaintiff's report of chronic neck and back pain (Tr. 301, 287, 285, 284, 282).  April, 2016 records by Dr. Askar report a switch in prescription from Flexeril to Robaxin (Tr. 283).  In May, 2016, Dr. Askar completed a Physical Residual Functional Capacity Questionnaire ("Medical Source Statement") noting diagnoses of CTS, chronic lower back pain, chronic neck pain, wrist pain, depression, anxiety, and bipolar disorder (Tr. 277-81, 278).  He deemed Plaintiff incapable of even "low stress" jobs (Tr. 278).  He found that she was unable to walk less than a city block, lift more than 10 pounds, or sit/stand for 15 minutes (Tr. 278,

---

[2] No medical record or imaging studies included with results from this follow-up appointment.

279).  He found that she should never look down, up, right or left, or hold her neck in a static position; or twist, stoop, crouch/squat, or climb ladders, or stairs (Tr. 280).  He found that due to pain, she was unable to concentrate for more than 15 minutes at a time (Tr. 279).

        2.   Records Related to Plaintiff's Psychological Treatment

August, 2015 intake records by Northeast Guidance Center ("NGC") show diagnoses of Bipolar Disorder and psychosis with a GAF score of 35 (Tr. 402, 415).  The assessment notes that Plaintiff's report of visual and auditory hallucinations, chronic depression and loss of interest, suicidal thoughts with no plan, recent memory loss, and sleep disturbances (Tr. 403, 404, 414, 415).  Plaintiff appeared oriented, aware, able to focus, and insightful, with an appropriate affect, speech, and presentation (Tr. 413-14).

September, 2015 records note Plaintiff's continued experience of auditory and visual hallucinations, sleep deprivation, and preoccupation with financial problems (Tr. 397-98, 390).  She was prescribed Latuda (Tr. 391, 395).

Records from October and November, 2015 show that Plaintiff experienced exclusively auditory hallucinations (Tr. 385, 378).  In February, 2016, Plaintiff denied recent hallucinations (Tr. 358).  In November, 2015 through January, 2016 she was advised to halve her Seroquel doses after experiencing the side effect of drowsiness(Tr. 376, 368, 365).

May, 2016 discharge records note that she experienced emotionally lability due to situational stressors (Tr. 353).  June, 2016 NGC records indicate that Plaintiff's neck discomfort does not allow her to sleep, but her evaluation symptoms were otherwise

normal and within normal limits (Tr. 336-39).  She showed consistently normal

psychomotor activity, affect, attention, concentration, speech, and thought process with

intact immediate, recent, and distant memory and with full orientation, goal directed

speech and adequate judgement (Tr. 392-94, 385-86, 377-79, 371-72, 358-59, 343-45,

337-39).

   3. Non-Treating Records

 In June, 2015 Bina Shaw, M.D. performed a consultative internal medicine evaluation

on behalf of the SSA, noting Plaintiff's history of chronic neck, back, and bilateral knee

pain, and that she was hit by a car at the age of nine but did not require surgery (Tr. 232).

Dr. Shaw noted that during the examination Plaintiff was alert and oriented, her speech

was normal, and she could remember her birthday and the current president (Tr. 233,

234).  She noted that Plaintiff's neck was supple with full range of motion and that there

was prominence of C5, C6, and C7 area, but the spine seemed to be in alignment (Tr.

233).

 During Dr. Shaw's musculoskeletal examination she noted that Plaintiff had full range

of motion of the C-spine; close to normal forward flexion, extension, rotation, and lateral

flexion; midline spine tenderness; and full range of motion of bilateral hips, knees, ankles,

shoulders, elbows, and wrists (Tr. 233, 235).  She also noted that Plaintiff's gait was

steady, her handgrips were equal, 5/5, she needed no assistance in getting off the table or

out of the chair, and she left with her cane in her left hand with no limp noted (Tr. 234,

238).

Dr. Shaw concluded that Plaintiff has mild chronic neck and thoracolumbar (spine) pain (Tr. 234). She reviewed the MRI and determined that it suggested a fused C2-C3 and mild degenerative disc disease (Tr. 234). She determined that Plaintiff can sit, stand, and walk for 8 hours a day; she can partially bend and lift at least 20 pounds without difficulty; she should avoid squatting, kneeling, and bending because of knee pain; and she does not need a cane (Tr. 234).

A.  Vocational Testimony

VE Sino amended his work summary of Plaintiff's past work experience, which consisted of security patrol and transportation driver, to include two more positions: childcare monitor and cafeteria attendant (Tr. 61). The VE described the position of childcare monitor as semi-skilled work with a level of Specific Vocational Preparation ("SVP") of 3 (Tr. 61). He explained that this work is performed, per the Dictionary of Occupational Titles ("DOT"), at the medium exertional level, but as performed by the Plaintiff, per her testimony, it is performed at the light exertional level (Tr. 61). DOT 301.677-010. The VE described the position of cafeteria attendant as unskilled work with a level of SVP 2 (Tr. 61). He explained that this work is performed at the light exertional level per the DOT and the Plaintiff (Tr. 61).

ALJ Tobin then presented six hypothetical examples to the VE. The first hypothetical offered by ALJ Tobin described an individual of Plaintiff's age, education level, and work history, but imposed the following parameters:

> [A]ssume the individual could perform work at the light exertional level with the following limitations: Occasionally climb ramps and stairs, occasionally climb ladders, ropes and scaffolds.  Occasionally stoop, kneel,

crouch, and crawl.  Could this hypothetical individual do any of the past
jobs you've described for us? (Tr. 61).

The VE testified that the above limitations would allow for Plaintiff to perform past

relevant work as a security patrol and cafeteria attendant, both as performed in the

national economy and by the Plaintiff (Tr. 62).  He also testified that the above limitations

would allow for Plaintiff to perform past relevant work as a transportation driver and as a

childcare monitor, both as performed by the Plaintiff, but not as performed in the national

economy (Tr. 62).  The VE testified further that there is a wide range of unskilled work at

the light exertional level, SVP 2, within the national economy (Tr. 62).  His examples

included a hand packager (greater than 250,000 positions nationally) (559.687-074);

small products assembler (250,000) (706.684-022); and visual inspector, checker

(200,000) (222.687-010) (Tr. 62).

The second hypothetical offered by ALJ Tobin described an individual of Plaintiff's

age, education level, and work history, but imposed the following parameters:

> [A]ssume this individual could perform work at the sedentary exertional
> level with the following limitations[: A] sit stand option allowing a change
> of position every 15 minutes if needed and without disturbing the
> workplace.  Never stooping, kneeling, or crouching, never climbing ramps
> and stair, never climbing ladders, ropes, and scaffolds.  Could this
> hypothetical person number two do any of the past work? (Tr. 62).

The VE testified that the above limitations would not allow for Plaintiff to perform

past relevant work (Tr. 63).  The VE testified further that there would be unskilled work

at the sedentary level, SVP 2, within the national economy (Tr. 63).  His examples

included a bench hand (200,000) (715.684-026); final assembler (200,000) (713.687-

018); and security monitor (120,000) (379.367-010) (Tr. 63).

The third hypothetical offered by ALJ Tobin described an individual of Plaintiff's age, education level, and work history, but imposed the following parameters:

> [A]ssume that this individual can perform work at the light exertional level with the following limitations[: O]ccasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, frequently balance and stoop, occasionally kneel, crouch, and crawl, never exposed to unprotected heights, never exposed to moving mechanical parts, and never exposed to operating a motor vehicle.  Could this hypothetical individual do any of the past work of the claimant? (Tr. 63).

The VE testified that the above limitations would allow for Plaintiff to perform past relevant work as a security patrol and cafeteria attendant, but not as a transportation driver, both as performed in the national economy and by the Plaintiff (Tr. 63, 4).  He also testified that the above limitations would allow for Plaintiff to perform past relevant work as a childcare monitor, as performed by the Plaintiff, but not as performed in the national economy (Tr. 63-4).  The VE testified further that the range of other work within the national economy was the same as given for hypothetical one (Tr. 64; Tr. 62).

The fourth hypothetical offered by ALJ Tobin was the same as hypothetical number three, with an additional limitation:

> [T]hat this individual would be able to use a cane to ambulate throughout the workday.  Does that change your answer at all from hypothetical three? (Tr. 64).

The VE testified that the above limitation would eliminate Plaintiff's past relevant work as a security patrol, cafeteria attendant, and childcare monitor (Tr. 64).  He clarified that the above limitation would allow Plaintiff to still perform the positions of hand packager, small products assembler, and visual inspector within the national economy (Tr. 64).  Because this limitation would require a "sit stand option" for all of these

positions, both positions of hand packager and small products assembler would be reduced to greater than 100,000 positions nationally, and the position of visual inspector would be reduced to greater than 80,000 positions nationally (Tr. 64).

The fifth hypothetical offered by ALJ Tobin described an individual of Plaintiff's age, education level, and work history, but imposed the following parameters:

> [A]ssume this individual can perform work at the light exertional level with the following limitations[: O]ccasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, frequently balance and stoop, occasionally kneel, crouch, and crawl, never exposed to unprotected heights, never exposed to moving mechanical parts, never exposed to operating a motor vehicle, limited to perform simple, routine tasks, use judgement in the workplace limited to simple work related decisions, frequent contact with supervisors, coworkers, and the public and would deal with changes in the work setting related to simple work related questions. Could hypothetical person number five do any of the past work attributed to this claimant? (Tr. 64-5).

The VE testified that the above limitations would allow for Plaintiff to perform past relevant work as a cafeteria attendant, both as performed in the national economy and by the Plaintiff, but all other past relevant work would be precluded (Tr. 65). He testified further that the range of other work within the national economy was the same as given for hypothetical one (Tr. 65; Tr. 62).

The sixth and final hypothetical offered by ALJ Tobin was the same as hypothetical number five, with an additional limitation:

> That this individual would not have a persistence, pace, or concentration to perform simple, routine tasks, in an eight hour day, five days a week, 40 hours a week, or an equivalent basis or that this individual would be off task 20 percent of the time or that this individual would be absent three or more days a month due to impairments. Could hypothetical person number six do any work in the national economy? (Tr. 65-6).

-12-

The VE testified that the above limitation would not offer Plaintiff any competitive full-time employment in the national economy (Tr. 66).

The VE stated that his testimony was based on information found in the DOT and Selected Characteristics of Occupations ("SCO"), except for his testimony regarding the "'sit stand option,' use of the ambulatory device, percentage off task, level of absenteeism, [and] all issues not addressed by the DOT nor the SCO" (Tr. 66). He further stated that his opinions regarding these issues were based upon his experience (Tr. 66).

**B. The ALJ's Determination (August 22, 2016)**

Citing the medical transcript, ALJ Tobin found that Plaintiff experienced the severe impairments of "spine disorder, dysfunction of major joints, and affective disorder (20 CFR 416.920(c))," and that these impairments more than minimally affected Plaintiff's ability to perform gainful activity; however, none of these impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 12,13). She also found that Plaintiff's obesity was non-severe and her alleged carpal tunnel syndrome was non-medically determinable (Tr. 12-13).

The ALJ determined that Plaintiff's musculoskeletal impairments, specifically her joint pain, did not satisfy the requirements of listing 1.02 (Tr. 13). There was no evidence from the medical records that Plaintiff's joint dysfunction was characterized by "gross anatomical deformity," or resulted in Plaintiff's "inability to ambulate" or "perform fine and gross movements effectively" as required in 1.02 (Tr. 13). The ALJ also found that

Plaintiff's back condition did not satisfy the requirements of listing 1.04 because there was no medical evidence that her back condition resulted in "compromise of a nerve root with evidence or nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in the inability to ambulate effectively" (Tr. 13).

The ALJ further found that Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04 because it did not satisfy the "paragraph B" or "paragraph C" criteria (Tr. 13-14). The supporting medical evidence indicated that Plaintiff experienced moderate restrictions in daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; no episodes of decompensation; no evidence of a residual disease process; and no evidence of an inability to function outside of highly supportive living arrangements (Tr. 13-14).

The ALJ noted that the MRI scan of Plaintiff's spine showed "mild" cervical and lumbar spondylosis with a disc herniation contributing to "mild" canal stenosis (Tr. 15). The ALJ observed that Plaintiff's doctor noted back pain and generalized joint pain with reduced range of motion, however, Plaintiff's physical examinations were generally unremarkable and showed no joint swelling or edema (Tr. 15-16). The MRI scan of Plaintiff's knee showed a small popliteal cyst, but was otherwise "unremarkable" (Tr. 16). The ALJ concluded that:

> [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision (Tr. 15).

Based on these findings, the ALJ determined that Plaintiff had an Residual Functional

Capacity ("RFC") for light work as defined in 20 CFR 416.967(b) with the following

additional restrictions:

> [O]ccasionally climb ramps and stairs; never climb ladders, ropes, or
> scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and
> crawl.  She should never be exposed to unprotected heights, moving
> mechanical parts, or operating a motor vehicle.  She is limited to
> performing simple routine tasks; and making simple work related decisions.
> The claimant can have frequent contact with supervisors, coworkers, and
> the public (Tr. 14).

With these limitations, the ALJ found that the Plaintiff was unable to perform any past

relevant work and was now limited to unskilled work (Tr. 17).  Citing the VE's

testimony, this unskilled work includes hand packager, small products assembler, or

visual inspector/checker (Tr. 18).

The ALJ gave great weight to the SSA examiner in diagnosing Plaintiff with a mild

degenerative disc disease because his statement was consistent with his examination and

with the record as a whole (Tr. 16, 17).  She gave little weight to Plaintiff's treating

physician because he pointed to no treatment records to support the extreme limitations

he describes, and his statements are inconsistent with the Plaintiff's unremarkable records

(Tr. 17).  She also gave little weight to the GAF score and Plaintiff's reported

hallucinations and depression, because a GAF score is transitory, subjective, and

unreliable, and her medical examinations were normal and unremarkable (Tr. 16, 17).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary*

*of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is

more than a scintilla, but less than a preponderance.  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated*

*Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of

review is deferential and "presupposes that there is a 'zone of choice' within which

decision makers can go either way, without interference from the courts."  *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).  In determining whether the evidence

is substantial, the court must "take into account whatever in the record fairly detracts

from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497

(6th Cir. 1985).  The court must examine the administrative record as a whole, and may

look to any evidence in the record, regardless of whether it has been cited by the ALJ.

*Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  In evaluating whether a claimant is disabled, the Commissioner is to

consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, [s]he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## V. ANALYSIS

Plaintiff makes four arguments for remand, contending first that the ALJ committed reversible error in failing to recontact the Plaintiff's treating medical provider pursuant to 20 C.F.R. § 404.1512(e). *Plaintiff's Brief* at 5, *Docket #15*, Pg ID 480. Plaintiff argues second that the State agency failed to comply with 20 C.F.R. § 404.1503(e) in not obtaining a psychological or psychiatric consultative evaluation once evidence of the existence of a mental impairment was discovered. *Plaintiff's Brief* at 8, *Docket #15*, Pg ID 483. Plaintiff's next argument is that there is no support for the ALJ's mental RFC assessments from any physicians in violation of SSR 83-10. *Plaintiff's Brief* at 10, *Docket #15*, Pg ID 485. Plaintiff's finally argues that the ALJ failed to properly assess the RFC as required by SSR 96-8p and SSR 85-15p. *Plaintiff's Brief* at 11, *Docket #15*, Pg ID 486.

**A. Recontact Treating Physicians**

Plaintiff argues that under 20 C.F.R. §§ 416.912(e)(1), 404.1512(e), the ALJ was required to recontact Dr. Askar because the medical evidence received was inadequate to make a disability determination since the ALJ stated that "[p]rogress notes from the claimant's primary doctor, Dr. Askar, are hand written and difficult to read (7F)" (Tr. 15). *Plaintiff's Brief* at 5-6, 7-8. Plaintiff also contends that the ALJ further violated 20 C.F.R. §404.1512(e) in not recontacting Dr. Askar for additional evidence or clarification of the difficult to read portions of the medical records (Tr. 277-281). *Plaintiff's Brief* at 7-8.

The regulation that Plaintiff's argument relies on is outdated and was no longer in effect at the time the ALJ made its determination. "An older version of the regulations required the ALJ to recontact medical sources if the evidence they provided was inadequate and the 'report ... contain[ed] a conflict or ambiguity that must be resolved ... [or] the report [did] not contain all the necessary information....'" 20 C.F.R. § 404.1512(e)(1) (2011); *Hollis v. Comm'r of Soc. Sec.,* No. 13-13054, 2015 WL 357133, at *23 (E.D. Mich. Jan. 27, 2015). Effective March 26, 2012, the provisions 20 C.F.R. §§ 416.920b(c), and 404.1520b(c)(1) replaced the older provisions 20 C.F.R. §§ 416.912(e)(1), and 404.1512(e)(1). The ALJs now have the flexibility to decide whether to recontact the medical sources or choose another option available under these new regulations. 20 C.F.R. §§ 404.1520b(c), 416.920b(c). *See Hollis v. Comm'r of Soc. Sec.,* 2015 WL 357133, at *23 (E.D. Mich. Jan. 27, 2015) (noting "ALJs now have discretion to decide whether to recontact"). The updated provisions state "[i]f the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if

after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, *we will determine the best way to resolve the inconsistency or insufficiency*." *How We Collect and Consider Evidence of Disability*, 77 FR 10651-01, 10655 (Feb. 23, 2012) (emphasis added).

As a matter of law, the Plaintiff's argument that the ALJ was required to recontact the medical source fails, as there is no longer any regulatory requirement mandating this as the sole option in the instance of insufficient or inconsistent evidence.  This same conclusion has been explained to Plaintiff's counsel in multiple other cases.  *See McClaine v. Comm'r of Soc. Sec.*, 2018 WL 1309877, at *7 (E.D. Mich.  Jan. 29, 2018), *rep. & rec. adopted*, No. 2018 WL 1291126 (E.D. Mich. March 3, 2018) (rejecting the same argument made by Plaintiff's counsel that the ALJ committed reversible error in failing to recontact the medical source under the outdated regulation); *Perry v. Comm'r of Soc.l Sec.*, 2016 WL 6828673, at *4 (E.D. Mich. Feb. 1, 2016) *rep. & rec. adopted*, 2016 WL 1084682, at *2 (E.D. Mich. March 21, 2016) (rejecting similar argument by Plaintiff's counsel and reiterating that the ALJ has discretion in determining whether to contact a medical source).

I also reject Plaintiff's argument that since the medical records were difficult to read, the ALJ erred in not recontacting Dr. Askar for an explanation of the limitations he imposed in his Medical Source Statement, and for additional evidence or clarification of the difficult to read portions of the medical records (Tr. 277-281).  *Plaintiff's Brief* at 7-8.  As mentioned above, not only does Plaintiff rely on an outdated regulation, but furthermore, 20 C.F.R. §§ 416.920b(b)(2), and 404.1520b(b)(2) state that only if the

evidence is consistent but insufficient to determine the alleged disability, or if the ALJ cannot reach a conclusion about the alleged disability, will the ALJ determine the best way to resolve this through one of several listed options, which includes but does not require, recontacting a medical source.  The ALJ's findings and the medical records clearly support the determination that the difficult to read portions of Dr. Askar's medical records were not entirely illegible, and in any event there was otherwise substantial evidence to support the non-disability finding.  20 C.F.R. §§ 416.920b(b)(2), 404.1520b(b)(2).  *See Anderson v. Astrue*, 2012 WL 4867703, at *12 (E.D. Mich. Sept. 18, 2012) *rep. & rec. adopted*, 2012 WL 4867703 (E.D. Mich. 2012) (admitting the medical records were not one-hundred percent legible, but there was substantial evidence to support the ALJ's conclusion); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 (6th Cir. 2010) (admitting that the medical records were only partially legible, consisting of phrases and not full sentences, but when viewing the entire record the court determined this was sufficient to uphold the district court's conclusion). *See also Poe v. Comm'r of Soc. Sec.,* 342 F. Appx. 149, at 157 n.3 (6th Cir. 2009) ("an ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician.")

Therefore, the ALJ acted properly and within her discretion in not recontacting Dr. Askar.

### B.  The Absence of a Significant Mental Impairment

Plaintiff next argues that under 20 C.F.R. §§404.1503(e), 404.903(e) the State agency is required to obtain a psychologist or psychiatrist to review a file if evidence of the existence of a mental impairment is discovered.  *Plaintiff's Brief* at 8.  Plaintiff further contends that the ALJ has the affirmative duty to develop the record. *Id.*

The regulation 20 C.F.R. §404.1503(e), is an extension of 42 U.S.C. §421(h), which states that, "in any case where there is evidence which indicates the existence of a mental impairment," an initial disability determination should not be made until "reasonable effort [has been made to] ensure…that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment."  *See Hudson v. Comm'r of Soc. Sec.*, 2017 WL 1030216, at *3 (E.D. Mich. 2017).  This court has previously held that "[t]he failure to consult with an expert requires remand only where there is '*significant evidence* of a possible mental impairment that allegedly prevented the claimant from working.'"  *Hudson v. Comm'r of Soc. Sec.*, at *3 (emphasis added);  *See Marcum v. Comm'r of Soc. Sec* 205 F.3d 1341, at *4 (6th Cir. 2000)(Table) (finding evidence insufficient to raise inference of significant mental impairment where the record contained a single report of depression and some reports of nonrestorative sleep);  *Lawson v. Chater*, 98 F.3d 1342, at *3 (6th Cir. 1996)(Table) (The ALJ considered Plaintiff's mental state and concluded that his depression "may impose a slight degree of limitation to activities of daily living and maintaining social functioning," but this did not comprise a "severe" impairment).  Plaintiff has not presented evidence of a significant disabling mental impairment.

Substantial evidence in the record supports the ALJ's finding that the Plaintiff's mental impairment did not meet or medically equal the criteria of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§ 416.920(d), 416.925, and 416.926) (Tr. 13).  The ALJ explained the considerations of her findings according to the "paragraph B" and "paragraph C" criteria found in listing 12.04 "Mental Impairments".  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ found that the supporting medical evidence indicated that Plaintiff experienced moderate restrictions in daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; no episodes of decompensation; no evidence of a residual disease process; and no evidence of an inability to function outside of highly supportive living arrangements (Tr. 13-14).  The mere existence of a mental diagnosis mentioned in the medical records does not suggest that Plaintiff necessarily had a determinable mental impairment or that it was even severe.  *Baxter v. Comm'r of Soc. Sec.,* 2018 WL 4474677, at *3 (E.D. Mich., July 24, 2018) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (Mere diagnosis of a condition says nothing about the severity of a condition)).  This is further supported by the ALJ's findings and the testimony of the Plaintiff that her limitations were attributed primarily to her physical condition, but made no mention that her alleged mental impairment inhibited her ability to work or function daily (Tr. 13, 15, 44-46, 54-55).

The NGC's medical records also lack significant findings of a mental impairment and were properly given little weight because of their subjective value and contradictive nature. *See Poe*, 342 F.Appx at 149.  ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Plaintiff's treating physician was not entitled to

deference because it was based on Plaintiff's subjective complaints, rather than objective medical data"). Plaintiff claimed to experience visual and auditory hallucinations, daily depressed mood and loss of interest, suicidal thoughts, recent memory loss, and only 1-3 hours of sleep per night (Tr. 403, 404, 414, 415). These complaints are inconsistent with the medical findings of NGC which note that her symptoms were otherwise normal and within normal limits (Tr. 342-45). Specifically, the NGC records indicate that Plaintiff was oriented, aware, able to focus, insightful, had an appropriate emotional state, and both her speech and presentation during her interview and examinations were unremarkable (Tr. 413-14). NGC records further note that Plaintiff's psychomotor activity, affect, attention, concentration, speech, and thought process were all within the normal limits[3]; her immediate memory was normal; she was alert and oriented to her person, place, and time during every examination; and she was goal oriented with adequate judgment (Tr. 392-94, 385-86, 377-79, 371-72, 358-59, 343-45, 337-39). These findings show that Plaintiff's alleged mental impairment is not supported, and even contradicted, by the objective and psychological evidence in her medical records. *See Ferguson v. Commissioner of Social Sec.*, 628 F.3d 269, 273 (6th Cir. 2010) (stating "[t]he most striking aspect of this case is the gulf between the claimant's complaints of

---

[3] Psychomotor activity that is not within normal limits is referred to as psychomotor retardation and is common in patients with depression and those with psychotic features. Manifestations of psychomotor retardation include slowed speech, decreased movement, and impaired cognitive function. Plaintiff's psychomotor activity was found to be within normal limits and not at this level which is commonly found in patients with the mental impairments that she alleges. *See* Jeylan S. Buyukdura et al., *Psychomotor retardation in depression: Biological underpinnings, measurement, and treatment,* 35 PROGRESS IN NEURO-PSYCHOPHARMACOLOGY & BIOLOGICAL PSYCHIATRY 395, 395 (2011).

extreme mental symptoms (e.g., panic attacks that last all day long, auditory hallucinations, communications from her television and computer directed specifically to her, and paranoid ideation) and the almost complete lack of objective evidence to support her dramatic complaints").

Plaintiff's argument that the ALJ violated his "affirmative duty to develop the record" is without merit. *Plaintiff's Brief* at 8. The Plaintiff bears the ultimate burden of proving a disability and it is not unreasonable to require the Plaintiff to provide information about her own medical condition since she is in a better position to do so. *See Wilson v. Comm'r of Soc. Sec.,* 280 F. Appx. 456, 459 (6th Cir. 2008) (The Court "repeatedly affirms that the claimant bears the ultimate burden of proving disability"); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). In this case, just as in *Hudson v. Comm'r of Soc. Sec.,* the "[p]laintiff was represented by counsel during the administrative proceedings; therefore, the ALJ did not have a heightened duty to develop the record and was entitled to 'rely on counsel to present [Plaintiff's] case and to develop her claims.'" *Hudson v. Comm'r of Soc. Sec.,* 2017 WL 1030216, at *3 (E.D. Mich., Feb. 22, 2017); *See also Woelk v. Comm'r of Soc. Sec.*, 2014 WL 2931411, at *2 (E.D. Mich. June 30, 2014) (stating "where…the claimant was represented by counsel, the ALJ may ordinarily rely on counsel to present the claimant's case and to develop his claims") (citing *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004)).

Furthermore, as stated above, during Plaintiff's June, 2016 hearing, Plaintiff mentioned her bipolar diagnosis and hallucinations, but she failed to testify that these had any impairment on her functional limitations (Tr. 54-55). Plaintiff gave absolutely no

objective evidence to support her allegation of a mental impairment, and no indication that this mental impairment was inhibiting her ability to work or function.  Instead, when the ALJ asked her why she believed herself to be unable to work, she testified that it was due to her physical impairments and medication side effects (Tr.44).  Plaintiff stated that her medications made her sleep most of the day (Tr. 44, 49, 53-54), and because of her back and knee issues, she needed multiple braces and a cane (Tr. 44-46).  She further stated that she was unable do anything without her braces and cane, and very little with them (Tr. 45-46, 48-51, 54, 55-57, 58).

Even more noteworthy is Plaintiff's testimony of her social limitations.  When the ALJ asked Plaintiff why she no longer interacted with family, friends, and groups like church or women's groups, Plaintiff initially stated that she didn't like to be in crowds, but then explained further that it was because of her physical pain that she was unable to move and get herself up and ready for church (Tr. 58).  The ALJ additionally noted that Plaintiff's medical records did not reflect any significant social limitations, and further review of the NGC's medical records support this finding, with regular evaluations of Plaintiff's symptoms being within normal limits (Tr. 13-14, 392-94, 385-86, 377-79, 371-72, 358-59, 342-45, 337-39).

Based on this evidence, the ALJ had no reason to believe that Plaintiff's alleged mental impairment warranted further evidentiary development because Plaintiff did not establish that this mental impairment had any effect on her functional limitations.

**C.** The RFC Assessment

In Plaintiff's final argument, Plaintiff claims that there is no opinion from a physician concerning her mental RFC as required by SSR 83-10. *Plaintiff's Brief* at 11. Plaintiff further argues that the ALJ's assessment of her RFC is conclusory and does not consider the impact of Plaintiff's mental impairment on her functional ability as required by SSR 96-8p and SSR 85-15. *Plaintiff's Brief* at 11, 13.

Plaintiff incorrectly asserts that a physician's assessment of her work-related functions is required by SSR 83-10 in determining a claimant's RFC. *Plaintiff's Brief* at 11. SSR 83-10 does not describe the way in which a Plaintiff's RFC is assessed, it merely provides "the manner in which the medical-vocational rules…address the issue of capability to do other work," and provides definitions used in evaluating disability under these rules. The responsibility of assessing an RFC is found under 20 C.F.R. § 416.946(c), which states that the ALJ is responsible for assessing the Plaintiff's RFC. "The term 'residual functional capacity assessment' describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence." SSR 96-5p (emphasis omitted). In forming her determination, the ALJ must "consider the opinion of a medical or psychological expert concerning whether [the] impairment(s) could reasonably be expected to produce [the] alleged symptoms," but she must also consider other medical and non-medical evidence from the record in forming her assessment. 20 C.F.R. § 416.929(b); *See* 20 C.F.R. § 416.945(e) ("In assessing the total limiting effects of [the] impairment(s) and any related symptoms, we

will consider all of the medical and nonmedical evidence").  This court has additionally

held that an ALJ's RFC assessment does not need to follow or be supported by a medical

opinion, especially where, as in this case, there is evidence to the contrary.  *Kolasa v.

Comm'r of Soc. Sec.*, 2015 WL 1119953, at *5 (E.D. Mich. Mar. 11, 2015) ("the ALJ

does not need a medical opinion to support his residual functional capacity determination

and does not have to adopt any medical opinion verbatim, especially when there is

contrary evidence"); *See Rudd v. Comm'r of Soc. Sec.*, 531 F.Appx. 719, 728 (6th Cir.

2013) ("ALJ was not required to base her determination on a medical opinion"); SSR 96-

6p (emphasizes that these medical opinions can only be given weight insofar as they are

supported by evidence in the record).  20 C.F.R. §§ 416.946(c), and 416.927(d)(2) further

provide that the final responsibility for deciding a Plaintiff's RFC is reserved to the

Commissioner.  The Commissioner's regulations clearly state that opinions on RFC

determinations "are not medical opinions … but are, instead, opinions on issues reserved

to the Commissioner because they are administrative findings that are dispositive of a

case."  20 C.F.R. § 416.927(d).  Requiring "the ALJ to base her RFC finding on a

physician's opinion, 'would, in effect, confer upon the treating source the authority to

make the determination or decision about whether an individual is under a disability, and

thus would be an abdication of the Commissioner's statutory responsibility to determine

whether an individual is disabled.'"  *Rudd v. Comm'r of Soc. Sec.*, 531 F.Appx. at 728;

SSR 96-5.  It is clearly established that SSR 83-10 does not require a physician's opinion

of work-related functions as a necessary basis for the ALJ's determination in a Plaintiff's

RFC assessment.

Plaintiff correctly notes that a GAF score does not include an assessment of one's ability to work. *Plaintiff's Brief* at 11; *See Jordan v. CSS*, 2011 WL 891198, *5 (E.D. Mich. Jan. 14, 2001) (GAF scores "subjective opinions, representing … [a] snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work"). The Plaintiff seems to suggest though, that the GAF score is the only pertinent psychiatric medical record that was provided to the ALJ, and that the ALJ incorrectly based her RFC assessment solely on this score. This assertion is incorrect. *Plaintiff's Brief* at 11. As explained above, the ALJ has the responsibility to include any and all provided medical evidence in her determination of a Plaintiff's RFC assessment. *See* SSR 96-5p ("Although the overall RFC assessment is an administrative finding on an issue reserved to the Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion"). Plaintiff's psychiatric medical source, NGC, provided the ALJ with 11 months of medical treatment records, which she used to support her findings (Tr. 16, 336-416). She also weighed this medical evidence according to several factors, with one important consideration being well-supported and medically accepted diagnostic techniques that were not inconsistent with other substantial evidence in the case record (Tr. 14). 20 C.F.R. §416.927(c); *See Prince v. Comm'r of Soc. Sec.,* No. 13-12055, 2014 WL 4639506, at *20 (E.D. Mich. Sept. 16, 2014) ("ALJ has considerable discretion in deciding what weight to give the various factors in the analysis"). The ALJ noted that Plaintiff claimed severe mental symptoms and was assigned a GAF score of 35, but she concluded that "[t]he claimant's allegations that she is unable to perform any work are not entirely supported by the record evidence" (Tr. 16).

-28-

She found that Plaintiff's "mental status examinations are repeatedly within normal limits…and do not indicate an inability to perform simple work" (Tr. 16). Based on the inconsistent findings from Plaintiff's psychiatric medical provider, the ALJ was correct in affording Dr. Shaw's findings great weight in her RFC assessment, and supplementing these findings with Plaintiff's own statements and the otherwise unremarkable medical records (Tr. 17).

As previously established, there is no objective medical evidence found in the record that indicates Plaintiff's alleged mental impairment is so substantial in nature as to inhibit her functional abilities to the extent that she claims. Therefore, Plaintiff's claim that her RFC assessment did not consider the impact of her alleged mental impairment on her functional ability is superfluous. *Plaintiff's Brief* at 13. Plaintiff additionally contends that the ALJ's opinion was conclusory and did not specifically outline the medical evidence in regards to her RFC determination. *Plaintiff's Brief* at 13. Plaintiff supports this contention with necessary work-related mental abilities found in SSR 96-8p: "Work-related mental activities generally…include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting"; and SSR 85-15: "unskilled work includes the abilities…to understand, carryout, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations and to deal with changes in a routine work setting." However, the record clearly shows that the ALJ did consider all medical evidence from every treating source in her final determination, specifically stating "[a]fter

careful consideration of the entire record…I have considered all symptoms and the extent to which these symptoms can reasonably be accepted…I have also considered opinion evidence." (Tr. 14-17).  The ALJ specifically reports in her opinion that "the claimant is able to follow instructions, and handle her own finances" (Tr. 15); "the examinations were otherwise unremarkable.  The claimant is regularly and repeatedly described as being cooperative, having normal affect, normal psychomotor activity, normal speech, goal directed thought processes, normal thought content, and normal attention and concentration" (Tr. 16); and "[the claimant's] mental status examinations are repeatedly within normal limits as discussed above, and do not indicate an inability to perform simple work" (Tr. 16).  This clearly establishes that the ALJ's opinion was not merely conclusory, she sufficiently provided the necessary medical evidence that she used in her determination of Plaintiff's RFC assessment.

Because the ALJ's RFC assessment is well supported and properly evaluated, the administrative determination should remain undisturbed.

## VI. CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgement [Docket #19] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 124 days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v.*

*Sec. of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec. of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 25, 2019

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on February 25, 2019, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen